PITMAN, J.
[)A jury convicted Defendant Joey Banks as charged of second degree kidnapping, first degree robbery and aggravated second degree battery. The trial court sentenced Defendant to 30 years at hard labor without the benefit of probation, parole or suspension of sentence for Count One, to 30 years at hard labor without the benefit of probation, parole or suspension of sentence for Count Two and to 10 years at hard labor for Count Three. The trial court ordered these sentences to run consecutively. Defendant now appeals his convictions and sentences. For the following reasons, we affirm.
FACTS
On April 25, 2012, the state charged Defendant and his co-defendants, Leonard Banks, William Johnson, Robert Banks, Otis Banks and Anthony Johnson, with aggravated kidnapping, conspiracy to commit aggravated kidnapping, aggravated second degree battery and conspiracy to commit second degree battery. On September 18, 2012, the state amended the charges against Defendant to add first degree robbery and conspiracy to commit first degree robbery.[1] On September 28, 2012, Defendant pled not guilty to the charges.
*1239 On May 3, 2013, the state amended the bill of information to charge Defendant and his brother, Leonard Banks, with second degree kidnapping, first degree robbery and aggravated second degree battery.
Trial began on May 6, 2013. During voir dire, Leonard Banks pled [ ¡«guilty. The trial court instructed the potential jurors not to infer anything from Leonard Banks’s absence. Once the jurors were impaneled, the defense moved to quash the venire, arguing that it was tainted by the absence of Leonard Banks. The state opposed the motion to quash, and the trial court denied the motion.
Shedrick Dorsey testified that, on the evening of February 26, 2012, at approximately 11:00 p.m., he was spending time with Latrail Seals, Kavin Talley and Darren Kennedy at the home of Seals (105 Madeline Street) in Rayville. He stated that they heard a noise outside the house, and he, Talley and Seals went outside into the front yard and heard tires pop. Dorsey explained that they walked to the back of the house and saw a group of six or seven men walking toward them. Dorsey stated that this group included Defendant, Leonard Banks, Otis Banks, William Johnson, Robert Banks and Anthony Johnson.[2] Dorsey testified that he thought there was going to be a fight and that Talley yelled, “Don’t go up there, Latrail, Duke [Defendant] got a gun!” Dorsey stated that they heard two gunshots and started running. Dorsey further testified that he ran until he reached a fence and, when he tried to jump over the fence, someone grabbed his shirt and started punching him in the face until he was bleeding. He stated that two people then dragged him into a burgundy Expedition and that he was afraid they were going to kill him. Dorsey explained that Defendant was in the driver’s seat, and William Johnson was in the passenger seat. He stated that, while he was in the car, something was placed over his head so that he could not see. | ¡.Dorsey testified that Defendant then drove the Expedition to a house (408 Oak Street) that Dorsey did not recognize. He explained that they then brought him inside the house and pulled something off his head so that he could see who all was there. Dorsey stated that he saw Defendant, Robert Banks, Leonard Banks, Anthony Johnson, William Johnson and Otis Banks. He testified that they put him on the floor and put dog food in front of him, and Otis Banks told him to eat the dog food. Dorsey testified that Otis Banks (whose house had been burned earlier in the evening) then asked him, “Who burned down the house?” and Dorsey answered that he did not know. Dorsey said that Otis Banks then burned him with an iron and asked again, “Who burned down the house?” Dorsey explained that, when he again said that he did not know, Otis Banks continued to burn him with an iron and also slapped him. Dorsey testified that Otis Banks burned him at least seven times, during which Defendant was in the room, but did nothing to stop Otis Banks. He explained that Otis Banks then stopped burning him and said that they were going to spare him and let him go. Dorsey testified that they took his money (approximately $100), his shoes and his phone. He stated that he never got back his money or shoes, but did get back his cell phone. Dorsey testified that they then put sheets over his head, took him from the house, put him in a car and dropped him off on the side of the road at approximately 1:00 a.m. on February 27, 2012.
*1240 Dorsey testified that he walked back to 105 Madeline Street and met up with Talley, Seals and Kennedy. He explained that, because of the burns, his arms, back and buttocks were hurting, but he did not go to the emergency |4room until the next day. Dorsey testified that he told Rayville police officers about the incident and took them to the house where he was burned and showed them the iron that was used. He stated that the police officers then took him back to the hospital, where photos of his injuries were taken. Dorsey identified photographs of the burns on his right arm, left arm and buttocks. He testified that his skin turned pink and that some of his skin came off because of the burns. Dorsey showed his arms to the jury, pointing out the burn marks that were not there before Otis Banks burned him.
Jerry Davis of the Rayville Police Department[3] testified that, on the night of February 26, 2012, the police department received phone calls about several disturbances and fights taking place in Rayville and that he responded to those locations. He stated that these altercations occurred at Branch Crossing, the Richland Apartments and South Circle Drive and involved the Bankses fighting a group that included Kavin Talley. He further stated that, when he arrived at each location, the Bankses were no longer there. Officer Davis testified that he then received a call to go to Madeline Street because shots had been fired. He explained that, when he arrived, he met with Kavin Talley and was informed that the Bankses had been there, but had left.
Officer Davis also testified that, on February 28, 2012, Dorsey came to the Ray-ville Police Department with his mother to give a statement. He explained that, on March 1, 2012, he and another officer took Dorsey on a | .¡drive as part of the investigation; and, while in the car, Dorsey noticed blankets on the side of the road and identified them as the blankets that had been placed over his head. He testified that they then went to 408 Oak Street, and Dorsey recognized it as the location where he was taken and showed the officers where his body was positioned during the burning, where the dog food was and where his blood was. Officer Davis stated that they found an iron, and Dorsey confirmed that it was the iron used to burn him. Officer Davis further stated that he observed Dorsey’s wounds, noting that “it was some type of ooze coming through the bandages,” so they then took Dorsey to the emergency room. He described the wounds as “his skin is completely off.... they’re open wounds.”
William Johnson, Robert Banks and Anthony Johnson all gave very similar testimony. William Johnson and Robert Banks explained that they went to Madeline Street for retaliation because someone had burned Otis Banks’s home that evening. All three testified that Defendant, Leonard Banks and William Johnson were in an Expedition, and Robert Banks and Anthony Johnson were in a Jeep. They testified that, when they got out of their vehicles, they came upon Dorsey, Seals and Talley, and both groups were ready to fight. Robert Banks and Anthony Johnson testified that Robert Banks had a gun, but that he put his gun back in the car. Both testified that Defendant then retrieved the gun and began shooting.[4] All three testified that they then went back to the cars and waited for Defendant and Leonard Banks to return. They testified that Defendant and Leonard Banks returned with Dorsey. William Johnson ex *1241 plained that Defendant | fiand Leonard Banks were walking on either side of Dorsey, each had him by an arm and Leonard Banks put Dorsey in the Expedition. He described Dorsey as “busted up around his face, bleeding” and “scared.” Robert Banks testified that Defendant was carrying a gun. William Johnson explained that Defendant drove the Expedition, that he (William Johnson) was in the passenger seat and Leonard Banks sat in the middle row with Dorsey. He stated that they then drove to 408 Oak Street and that Robert Banks and Anthony Johnson followed in the Jeep. William Johnson, Robert Banks and Anthony Johnson testified that, once they arrived at 408 Oak Street, Leonard Banks pulled Dorsey from the Expedition and began beating him. William Johnson testified that Leonard Banks made Dorsey eat dog food.[5] All three testified that Otis Banks burned Dorsey with an iron. William Johnson and Robert Banks explained that Otis Banks began asking Dorsey if he knew who burned his house, Dorsey said he did not know what he was talking about and did not know who burned the house and Otis Banks then burned Dorsey on the arm with an iron. Robert Banks explained that Otis Banks kept asking Dorsey who burned his house down, and each time Dorsey answered that he did not know, Otis Banks would burn him on the arms or buttocks. All three testified that Defendant was present when Otis Banks burned Dorsey. William Johnson testified that he and Anthony Johnson then left because “it was crazy” in the house, and Anthony Johnson was scared. Robert Banks testified that he and Anthony Johnson dropped 17Porsey off and gave him his phone back.[6]
Otis Banks testified that, on February 26, 2012, he, Defendant, Robert Banks, William Johnson and others were involved in fights at Branch Crossing and South Circle Drive. He stated that they next went to Anthony Johnson’s mother’s house; and, while there, Angie Littleton picked up Defendant. He stated that he was not sure what time Defendant left, but that it was nighttime and it was before the altercation at 105 Madeline Street and before Dorsey was kidnapped and burned. Otis Banks admitted that he burned Dorsey on his arms and buttocks with an iron and that Leonard Banks, Robert Banks, Anthony Johnson and William Johnson were all present at 408 Oak Street, but Defendant was not there.
Angela Littleton testified that, on February 26, 2012, she received a call from Defendant at 10:00 or 10:15 p.m. asking her to come pick him up. She stated that she drove from Monroe to Rayville and picked up Defendant at the Johnson home between 10:80 and 10:45 p.m. She said she then took Defendant back to her home in Monroe.
Kewanna Lavall testified that she rode with Angela Littleton from Monroe to Rayville to pick up Defendant. She stated that this occurred after 10 p.m., but she was not sure exactly what day it was. She explained that after they picked up Defendant, they drove him back to Monroe.
Fannie Williams testified that, on February 26, 2012, she was dating both Defendant and Dorsey and, at the time of trial, was dating Dorsey. She stated that she was on the phone with Defendant “around the same time this was supposed to be happening and Joey couldn’t possibly be in two places at Rone time.” She explained that she talked to Defendant on Angela Littleton’s phone as they were driving to *1242 Monroe. She also testified that she and Dorsey had talked about what happened on February 26, 2012, but that Dorsey never “implicated” Defendant.
Defendant testified that, in the days leading up to the events of February 26, 2012, he and Kavin Talley had been “getting into it” with “just words.” He explained that there was a big fight at Branch Crossing and then Talley and Dorsey ambushed Defendant’s group in the projects at the Richland Apartments and busted all the tires on the Expedition. He further explained that they then went to Jackie Johnson’s house and Angela Little-ton picked him up from there, but he was not sure what time she picked him up, maybe 10 p.m. He testified that he was not involved in the kidnapping or in the events at 408 Oak Street.
On May 9, 2013, the jury found Defendant guilty as charged as to all three counts. The trial court ordered a presen-tence investigation report.
On June 12, 2018, the trial court sentenced Defendant to 30 years at hard labor without the benefit of probation, parole or suspension of sentence for the second degree kidnapping charge, to 30 years at hard labor without the benefit of probation, parole or suspension of sentence for the first degree robbery charge and 10 years at hard labor for the aggravated second degree battery charge, with all three sentences to run consecutively to each other. The trial court also noted that Defendant received credit for time served. Defendant’s attorney objected to the sentences as excessive.
Defendant appeals his convictions and sentences.

DISCUSSION

1 flSufficiency of the Evidence
In his first assignment of error, Defendant argues that the evidence presented at trial was insufficient to support any of the convictions. Defendant contends that the state’s case consisted of self-serving testimony of persons charged with the same crimes as Defendant and that the testimonies differ as to the facts. Defendant argues that the state did not meet its burden of proof, particularly as to the charge of first degree robbery. He contends that only Dorsey and Robert Banks testified about a robbery and that there is no evidence that he led Dorsey to believe he was armed with a dangerous weapon.
The state argues that it established all of the essential elements of second degree kidnapping, first degree robbery and aggravated second degree battery.
The standard of appellate review for a sufficiency of the evidence claim is “whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Hearold, 603 So.2d 731 (La.1992); State v. Smith, 47,983 (La.App.2d Cir.5/15/13), 116 So.3d 884. See also La. C. Cr. P. art. 821. This standard does not provide an appellate court with a vehicle for substituting its appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La.2/22/06), 922 So.2d 517; State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165.
Where there is conflicting testimony about factual matters, the Irresolution of which depends upon a determination of the credibility of a witness, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen, 36,180 (La.App.2d Cir.9/18/02), 828 So.2d 622, writ denied, 02-2595 (La.3/28/03), 840 So.2d 566 and writ denied, 02-2997 (La.6/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).
*1243 The trier of fact makes credibility determinations and may accept or reject the testimony of any- witness. State v. Casey, 99-0023 (La.1/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000). A reviewing court may not impinge on the fact finder’s discretion unless it is necessary to guarantee the fundamental due process of law. Id. The appellate court does not assess credibility or reweigh the evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App.2d Cir.8/30/02), 827 So.2d 508, writ denied, 02-3090 (La.11/14/03), 858 So.2d 422.
Thus, in order for Defendant’s convictions to be upheld, the record must establish that the state proved beyond a reasonable doubt all of the essential elements of second degree kidnapping, first degree robbery and aggravated second degree battery.
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, |naid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals. La. R.S. 14:24.
Although Defendant argues that the witnesses provided conflicting testimony, She-drick Dorsey, Robert Banks, William Johnson and Anthony Johnson gave very similar testimony concerning the essential facts of this case. Each detailed Defendant’s presence and involvement during the kidnapping, robbery and battery and demonstrated that Defendant was a principal to these crimes.
La. R.S. 14:44.1 defines second degree kidnapping as follows:
A. Second degree kidnapping is the doing of any of the acts listed in Subsection B wherein the victim is:
(1) Used as a shield or hostage;
(2) Used to facilitate the commission of a felony or the flight after an attempt to commit or the commission of a felony;
(3) Physically injured or sexually abused;
(4) Imprisoned or kidnapped for seventy-two or more hours, except as provided in R.S. 14:45(A)(4) or (5); or
(5) Imprisoned or kidnapped when the offender is armed with a dangerous weapon or leads the victim to reasonably believe he is armed with a dangerous weapon.
B. For purposes of this Section, kidnapping is:
(1) The forcible seizing and carrying of any person from one place to another; or
(2) The enticing or persuading of any person to go from one place to another; or
(3) The imprisoning or forcible secreting of any person.
La. R.S. 14:2(A)(3) defines a dangerous weapon as “any gas, liquid or other substance or instrumentality, which, in the manner used, is calculated or likely to produce death or great bodily harm.” The state relied on three definitions of second degree kidnapping found in La. R.S. 14:44.1(A)(3) and (A)(5), i.e., that Dorsey was forcibly seized and carried from one place to another when (1) he was physically injured, (2) he reasonably believed that the offender was armed with a dangerous weapon and/or (3) the | ^offender was armed with a dangerous weapon.
The facts presented at trial demonstrate that Defendant was a principal in *1244 the commission of second degree kidnapping. Defendant fired a gun, i.e., a dangerous weapon, and then chased Dorsey while still armed. Defendant and Leonard Banks battered Dorsey in the face until he was bleeding and then took him by each arm and forced him into their vehicle and took him to 408 Oak Street. Defendant forcibly seized and carried Dorsey from 105 Madeline Street to 408 Oak Street while Dorsey was physically injured and Defendant was armed with a dangerous weapon, i.e., a gun, or led Dorsey to reasonably believe he was armed with a dangerous weapon. Therefore, the state established that Defendant committed the crime of second degree kidnapping three different ways. Viewing the evidence in the light most favorable to the prosecution, a reasonable trier of fact could have found that the state presented sufficient evidence at trial to establish the essential elements of second degree kidnapping beyond a reasonable doubt.
La. R.S. 14:64.1 defines first degree robbery as follows:
First degree robbery is the taking of anything of value belonging to another from the person of another, or that is in the immediate control of another, by use of force or intimidation, when the offender leads the victim to reasonably believe he is armed with a dangerous weapon.
The facts presented at trial establish that Defendant was a principal in the commission of first degree robbery. At trial, the state presented evidence that things of value, i.e., shoes, money (approximately $100) and a phone, were taken from Dorsey by force or intimidation, i.e., Dorsey had been | ^kidnapped and was being beaten and burned, while the offender led Dorsey to reasonably believe he was armed with a dangerous weapon. There are two dangerous weapons in this case, the gun fired and carried by Defendant and the iron wielded by Otis Banks. Viewing the evidence in the light most favorable to the prosecution, a reasonable trier of fact could have found that the state presented sufficient evidence at trial to establish the essential elements of first degree robbery beyond a reasonable doubt.
La. R.S. 14:34.7 defines the elements of aggravated second degree battery and states, in pertinent part, that:
A. Aggravated second degree battery is a battery committed with a dangerous weapon when the offender intentionally inflicts serious bodily injury.
B. For purposes of this Section, the following words shall have the following meanings:
[[Image here]]
(3) “Serious bodily injury” means bodily injury which involves unconsciousness, extreme physical pain or protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or a substantial risk of death.
The facts presented at trial demonstrate that Defendant was a principal in the commission of aggravated second degree battery. Defendant drove Dorsey to the location of the battery at 408 Oak Street. Dorsey, Robert Banks, William Johnson and Anthony Johnson all testified that Defendant was present at 408 Oak Street while Dorsey was punched, kicked and burned multiple times with an iron, i.e., a dangerous weapon. Dorsey suffered serious bodily injury to his arms and buttocks in that his skin turned pink, peeled off and oozed as a result of the burning. These injuries caused extreme physical pain and protracted and obvious disfigurement. 114Photographs taken of Dorsey’s injuries several days after the burning were shown to the jury, and Dorsey also showed the jury the scars that remained on his arms. Viewing the evidence in the *1245 light most favorable to the prosecution, a reasonable trier of fact could have found that the state presented sufficient evidence at trial to establish the essential elements of aggravated second degree battery beyond a reasonable doubt.
The evidence presented at trial was clearly sufficient to sustain all three convictions of Defendant. Therefore, we find that this assignment of error lacks merit.

Motion to Quash and Motion for Mistrial

In his second assignment of error, Defendant argues that the trial court erred in denying his motion to quash the jury venire or, alternatively, in failing to grant a mistrial when his codefendant pled guilty on the third day of voir dire. Defendant contends that the trial court only gave the jury venire one instruction concerning the absence of the codefendant and did not give an additional instruction or reminder in the final jury instructions. He argues that this conduct was prejudicial to him and made it impossible for him to receive a fair trial.
The state argues that the trial court followed the appropriate procedures to safeguard Defendant’s due process rights and properly denied Defendant’s motion for mistrial. The state explains that the trial court instructed the jury not to consider the absence of Leonard Banks, and Defendant did not object to the wording of the admonition and, in fact, agreed that it was appropriate. The state also explains that defense counsel made an oral motion to quash the jury venire, but that the trial court Incorrectly treated this motion as a request for mistrial and denied the motion because there was no proof of prejudice of Defendant.
A motion to quash may be based on the ground that the jury venire was improperly drawn, selected or constituted. La. C. Cr. P. art. 532(9). A motion to quash shall be in writing and specify distinctly the grounds on which it is based. La. C. Cr. P. art. 536.
La. C. Cr. P. art. 775 states that a mistrial may be ordered, and in a jury case the jury dismissed, when:
(1) The defendant consents thereto;
(2) The jury is unable to agree upon a verdict;
(3) There is a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law;
(4) The court finds that the defendant does not have the mental capacity to proceed;
(5) It is physically impossible to proceed with the trial in conformity with law; or
(6) False statements of a juror on voir dire prevent a fair trial.
Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.
A mistrial shall be ordered, and in a jury case the jury dismissed, when the state and the defendant jointly move for a mistrial.
La. C. Cr. P. art. 770 sets forth the grounds for declaring a mistrial when a prejudicial remark or comment was made within the hearing of the jury during the trial or in argument. La. C. Cr. P. art. 771 sets forth the grounds for admonishing the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury.
|1(iIn the case sub judice, as noted, code-fendant Leonard Banks pled guilty outside the presence of the jury venire. When the jury venire returned to the courtroom, the *1246 trial court instructed the jury venire as follows:
All right. Let me — let the record reflect the defendant Joey Banks is present in Court with his attorney. Let me say to the members here and the members out there, you’ll notice there’s one defendant not here or the attorney. You are to make no inference or assumption as to why the codefendant is no longer present in this proceeding, you’re to only focus on the charges against this defendant, and the absence of the co-defendant is not to be considered by you in any manner in this proceeding.
Once the jurors were impaneled, defense counsel made an oral motion to quash the venire, which the trial court denied.
Defense counsel did not file a written motion to quash as required by La. C. Cr. P. arts. 532 and 536. Therefore, the trial court did not err in denying the motion to quash or in denying a mistrial. Defendant did not demonstrate that he was entitled to a mistrial pursuant to La. C. Cr. P. arts. 770 or 775. Defendant has not established that he was prejudiced by the codefen-dant’s absence or the trial court’s admonition to the jury. The trial court properly instructed the jury not to make any inferences or assumptions with regard to the absence of the codefendant. Therefore, this assignment of error lacks merit.

Excessive Sentence

In his third assignment of error, Defendant argues that his sentences are unconstitutionally excessive. Defendant contends that, because of the consecutive nature of the sentences, as a 26-year-old, he faces a minimum of 59.5 years in prison before release for his 70-year cumulative sentence. Defendant argues that the sentences are excessive under the facts of the case | )7because he did not hit Dorsey, did not put him in the vehicle, did not take any belongings from him, did not drop him off after the incident, did not burn him and did not make him eat dog food.
The state argues that the facts of this case and Defendant’s extensive criminal background justify the sentences imposed.
When reviewing an excessive sentence claim, the appellate court uses a two-prong test. First, the trial record must demonstrate that the trial court complied with La. C. Cr. P. art. 894.1. The trial court is not required to list every aggravating and mitigating circumstance, but the record must reflect that the trial court adequately considered the guidelines of La. C. Cr. P. art. 894.1. State v. Smith, 433 So.2d 688 (La.1983). The trial court should consider the defendant’s personal history and prior criminal record, the seriousness of the offense, the likelihood that the defendant will commit another crime and the defendant’s potential for rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981). The trial court is not required to assign any particular weight to any specific matters at sentencing. State v. Quiambao, 36,587 (La.App.2d Cir.12/11/02), 833 So.2d 1103, writ denied, 03-0477 (La.5/16/03), 843 So.2d 1130. When the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary, even where there has not been full compliance with La. C. Cr. P. art. 894.1. State v. Landos, 419 So.2d 475 (La.1982).
The trial court adequately complied with La. C. Cr. P. art 894.1. During the sentencing hearing, the trial court noted that it had reviewed the presen-tence investigation report and discussed facts from the trial. The trial court stated the possible sentences for each charge, noting that the victim’s [ ^mother and aunt both submitted letters describing the effects of the kidnapping, robbery and battery on Shedriek Dorsey. The trial court discussed Defendant’s “significant” and *1247 “horrible” criminal record, including three prior felonies — unauthorized use of a movable, possession of cocaine with intent to distribute and attempted possession of cocaine with intent to distribute — and numerous misdemeanors. The trial court further noted that, each time Defendant was placed on probation or parole, it has been revoked. The trial court also detailed Defendant’s social history, including that Defendant was 26 years old, dropped out of school in the tenth grade and may have mental health problems.
The trial court stated that it has considered all aggravating and mitigating circumstances and the La. C. Cr. P. art. 894.1 factors. The trial court found the only mitigating factors to be that Defendant has a one-year-old child, that he has a form of disability and, although Defendant was not the one who tortured Shedrick Dorsey, he played a “huge major part in that incident.” As aggravating factors, the trial court listed an “unbelievable” criminal record and the facts of the crime, which included deliberate cruelty, a dangerous weapon and significant permanent damage to the victim. The trial court also noted that it believes Defendant committed perjury and that neither it nor the jury believed a word of Defendant’s testimony. The trial court further noted that Defendant is someone “that needs to be incarcerated for a very long time.”
As to the first prong of the excessive-sentence test, this court finds that the trial court adequately complied with La. C. Cr. P. art. 894.1 when ] 19sentencing Defendant. At the sentencing hearing, the trial court noted in detail the aggravating and mitigating circumstances it considered when deciding Defendant’s sentence.
Second, the appellate court must determine if the sentence is constitutionally excessive. A sentence is excessive and violates La. Const. Art. 1, § 20, if it is grossly out of proportion to the severity of the crime or is nothing more than the purposeless and needless imposition of pain and suffering. State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. Id. A trial court has wide discretion in imposing a sentence within the statutory limits, and a sentence should not be set aside absent a showing of abuse of discretion. State v. Square, 433 So.2d 104 (La.1983); State v. Black, 28,100 (La.App.2d Cir.2/28/96), 669 So.2d 667, writ denied, 96-0836 (La.9/20/96), 679 So.2d 430.
A person convicted of second degree kidnapping shall be imprisoned at hard labor for not less than 5 nor more than 40 years with at least 2 years of the sentence imposed without benefit of parole, probation or suspension of sentence. La. R.S. 14:44.1(C). A person convicted of first degree robbery shall be imprisoned at hard labor for not less than 3 nor more than 40 years, without benefit of parole, probation or suspension of imposition or execution of sentence. La. R.S. 14:64.1(B). A person convicted of aggravated second degree battery shall be fined not more than $10,000 or imprisoned, with or without hard labor, for not more than 15 years, or both. La. R.S. 14:34.7(C). The trial court sentenced Defendant to 30 years at hard labor |2nwithout the benefit of probation, parole or suspension of sentence for the second degree kidnapping conviction, to 30 years at hard labor without the benefit of probation, parole or suspension of sentence for the first degree robbery conviction and to 10 years at hard labor for the aggravated second degree battery conviction. All of the sentences imposed are within statutory bounds and none are the statutory maximum. Based on the law and the facts of the case, the sentences are not out of proportion to the severity of these crimes and do not shock the sense of *1248 justice. Therefore, we conclude that the trial court did not abuse its wide discretion in sentencing Defendant.
When a defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. La. C. Cr. P. art. 883. This court, in State v. Boudreaux, 41,660 (La.App.2d Cir.12/13/06), 945 So.2d 898, writ denied, 07-0058 (La.11/2/07), 966 So.2d 591, set forth the law as to consecutive and concurrent sentences, stating:
Concurrent sentences arising out of a single cause of conduct are not mandatory, and it is within a trial court’s discretion to order sentences to run consecutively rather than concurrently.
A judgment directing that sentences arising from a single course of conduct be served consecutively requires particular justification from the evidence or record. When consecutive sentences are imposed, the court shall state the factors considered and its reasons for the consecutive terms.
Among the factors to be considered are the defendant’s criminal history, the gravity or dangerousness of the offense, the viciousness of the crimes, the harm done to the victims, whether the defendant constitutes an unusual risk of danger to the public, the potential for defendant’s rehabilitation, and whether defendant has received a benefit from a plea bargain.
... [T]he failure to articulate specific reasons for consecutive sentences does not require remand if the record provides an adequate factual basis to support consecutive sentences.
121 (Internal citations omitted.)
Although the trial court did not articulate specific reasons for consecutive sentences, its detailed reasons for sentencing and the record itself provide an adequate factual basis to support consecutive sentences. The trial court noted Defendant’s “terrible” criminal history and that he is a third felony offender. The trial court stated that Defendant is someone “that needs to be incarcerated for a very long time.” The trial court also detailed the facts of this case and emphasized Defendant’s “participation in this horrible crime.” We find, therefore, that the trial court did not err in ordering consecutive sentences.
As to the second prong of the excessive-sentence test, this court finds that the sentence is not constitutionally excessive. Therefore, this assignment of error lacks merit.

CONCLUSION

For the foregoing reasons, the convictions and sentences of Defendant, JOEY BANKS, are affirmed.
AFFIRMED.

. On April 15, 2013, the state filed another amended bill of information to charge Defendant and Leonard Banks with aggravated kidnapping, conspiracy to commit aggravated kidnapping, first degree robbery, conspiracy to commit first degree robbery, aggravated second degree battery and conspiracy to commit second degree battery.

. Throughout the trial, the witnesses often referred to these men by their nicknames. Defendant is "Duke,” Leonard Banks is “Bunkie,” William Johnson is "Chuckie,” Robert Banks is "Peanut” and Anthony Johnson is "Chub.”

. At the time of trial, Jerry Davis was no longer employed by the Rayville Police Department.

. William Johnson testified that shots were fired but did not state who fired the gun.

. Robert Banks testified that he was not sure if Leonard Banks or Otis Banks made Dorsey eat dog food.

. Robert Banks testified that he did not know any money was taken from Dorsey.