LOLLEY, J.
| ]This criminal appeal arises from the Fourth Judicial District Court, Parish of Ouachita,- State of Louisiana. The defendant, Terrese Robinson,[1] was charged by bill of indictment with two counts of aggravated rape, second degree kidnapping,' attempted second degree kidnapping, carjacking, and felony theft. The indictment was amended two times without changing the substance of the charges. A jury unanimously found Robinson guilty as charged on all six counts. After a subsequent sentencing hearing, Robinson received maximum sentences on all counts. He appeals his convictions and sentences.
Facts
The following facts were gleaned from witness testimony and evidence at trial. All of the crimes of conviction occurred on three separate days, upon three victims in Monroe, Louisiana, in January 2013.
Victim One — MB
MB testified that on Friday, January 18, 2013, she was a student at the University of Louisiana at Monroe (“ULM”). She had an 8:00 a.m. Friday class at Hemphill Hall on the campus. On her walk to class, a man approached her and began to speak *834 with her, asking about her major and where she was going. When MB told him she was walking to class, the man told her he had a gun and to come with him. MB tried to escape, but the man threatened to hurt her. MB believed that he had a gun, because his hand was inside his jacket, out of her view. The man took MB just off campus, into the shed of an abandoned home. Inside the shed, the man then 12told her he was not going to rob her, but that he wanted sex. MB tried to fight him, but the man began to choke her until she nearly lost consciousness. MB believed he was going to kill her. The man told MB to undress and then made her lie down; he removed his pants, and put a condom on. MB begged him not to, but the man attempted to penetrate her. The man then began to perform oral sex on MB and attempted to rape her. The man then removed the condom, penetrated her, and raped her vaginally. The man ejaculated on the floor. The man took the used condom and placed it in an egg carton, and placed that in a trash can outside. He then grabbed MB by the arm and led her back to the place on campus where he had first taken her.
MB went to Madison Hall dormitory for help from her friends, who called the police, her sister, and her parents. The university police and Monroe city police came to the dorm. MB was then taken to Saint Francis Hospital emergency room for a rape examination. MB and her sister, who also attended ULM, packed their belongings and left school that day to return home. MB subsequently gave a detailed statement of the incident to the police in the days following her return home. .
Officer Dennis Sims testified that he was employed with the ULM Police Department at the time of MB’s attack. Officer Sims was dispatched to Madison Hall dormitory the morning of January 18, 2013, where he made contact with the occupants of room 208 of the dormitory, MB and her friends. According to Off. Sims, MB was hyperventilating and hysterical. Her friends described to him how MB had arrived in their room: disheveled |sand upset with the news she had been kidnapped and raped. MB reported to Off. Sims that an unknown black male had approached her, told her he had a gun, and threatened to hurt her. MB also told Off. Sims that the unknown man walked her off campus to an unknown location, later identified as 3304 Armand Street, where he raped her. MB’s statement was detailed he said, but also hysterical, and he had to put it together in bits and pieces throughout their conversation. Officer Sims contacted his supervisors, Lieutenant Meeham and Detective Kevin Bonner, who arrived at the room. The ULM Police Department subsequently located the ■ crime scene, and Off. Sims went to the location of the rape. He testified that he saw, in plain view, a condom thrown on top of an egg crate in the trash can outside. Officer Sims testified that MB’s clothes were dirty and her hair was messed up, but he did not see observable injuries.
Detective Bonner with the ULM Police Department testified that he was called in to work on his day off on January 18, 2013. At the police station, Det. Bonner gathered things he would need for an investigation, and he went to the crime scene, 3304 Armand Street. Detective Bonner was briefed on MB’s statement to Off. Sims. Detective Bonner photographed the scene and described at trial the photographs he took of the scene. While there, Det. Bonner found one earring on the ground in the shed. He then left and went to Saint Francis Hospital, where MB was. He spoke with MB, who also provided him with a written statement. A rape kit was taken at the hospital, and signed over to Det. Bonner through a Physical Evidence *835 Transfer Sheet (“PERK”). Detective Bonner signed over all of the evidence |4he collected at the scene and the rape kit, to Det. Jim Booth of the Monroe Police Department. At trial, Det. Bonner identified State’s Exhibit 4 as the condom containing semen that was taken from the scene of the crime. Detective Bonner said that MB only had on one earring at the hospital when he spoke with her. MB never told Detective Bonner that she felt or saw a gun, but that the man told her he had a gun and she believed him.
Detective James A. Booth, a sergeant for the Monroe Police Department, formerly a Child Abuse and Sex Crimes Detective, testified that on January 18, 2013, he was called to investigate a rape at 3304 Armand Street. The ULM Police Department was already there, and Booth obtained from them the evidence they had gathered. Detective Booth testified that the following Monday, he spoke with MB, who described the incident to him. Detective Booth determined that the residence where the crime took place was vacant.
Stephanie Gullete, a Sexual Assault Nurse Examiner, is the program coordinator for the coroner’s office for examining sexual assault patients. At trial, Gullete explained that she collects evidence of sexual assault in a PERK. On January 18, 2013, she performed a physical examination on MB at Saint Francis Hospital. Gullete said that MB was tearful and quiet during the exam, but cooperative. MB gave her consent to the physical exam. MB reported to her that she was penetrated vaginally by her attacker, with his penis, and that he had put his mouth on her genital area. In addition to the examination, Gullete photographed MB. Gullete testified as to the contents of State’s Exhibit 10-1, the PERK taken from MB’s examination at the |shospital. In the kit were the clothes MB wore that day and swabs used on her body to collect any DNA evidence of the attacker. Gullete gave the PERK to Detective Bonner.
Victim Two — LF
LF testified that on January 26, 2013, she was working at Walmart in Monroe. LF got off work at 1:00 p.m. and drove home to her apartment, Parish Square Apartments on Blank Street. When LF parked at her apartments, she saw a black male she did not recognize as a resident in front of the stairs to her apartment. She sat in her car and watched him, thinking he would leave. The man made her nervous. LF decided to get out of her car and proceed to her apartment. The man asked LF for some change as she passed him, and LF ignored him. The man walked behind her, so LF began to pick up her pace to the door. As LF arrived at her door, the man was right behind her. The man told LF that if she did not unlock the door, he would shoot her. He had his hand in his pocket, and LF believed that he had a gun. LF opened the door, he pushed her inside, and closed and locked the door. She screamed, and the man choked her around her neck, and told her if she made any more noise, he would shoot her. The man pushed her toward a love seat in the room and told her to undress. The man still had his hand around her neck; he loosened his grip, and pushed LF to her knees. The man pulled his pants down and raped LF. LF was pushed into the love seat, facing away from him. LF never saw a gun. LF did not know if the man used a condom or ejaculated.
| rAfter he raped LF, the man made her shower. LF said that she did not thoroughly wash herself, hoping to preserve evidence if possible. The man found cleaning supplies, and put bleach on her love seat. The man also sprayed LF with the bleach. The man left, taking LF’s cell *836 phone and car keys, and then left the apartment in LF’s Mercury Milan. LF went next door to a neighbor’s house and called 911. LF described the man as having a tattoo on his neck and his hand. The police came to LF’s apartment shortly after the rape. She was taken to Saint Francis Hospital emergency room where a physical examination and a rape kit were conducted.
Sierra Ellis, a resident at Parish Square Apartments, testified that she saw an unknown black male at her apartment on the day of LF’s rape. Ellis saw the man in the laundry room. When Ellis got to the laundry room, the lights were off, which she said was unusual. When she flipped the lights on, the man was standing in the washroom of the apartment complex. Ellis was startled, but she got a good look at the man. The man walked past her and out of the room. Following the rape, Ellis was shown a photo lineup and identified Robinson when she was interviewed by the Monroe Police Department. She identified the defendant in the courtroom as the man she saw that day in the laundry room.
Meshionte Jones, another resident at Parish Square Apartments, testified that she was approached by an unknown man while she was in her car heading to the store on the day of LF’s rape. The man asked her if she had spare change, and asked her if she had a boyfriend. Jones responded “no,” closed her vehicle door, and drove away. Jones spoke with police 17about the incident. Jones identified the defendant in the courtroom as the man she saw at the apartment on the day of the incident.
Officer Bruce Brown, a patrolman with the Monroe Police Department, testified that he responded to a rape on January 26, 2013, at Parish Square Apartments. Officer Brown spoke with LF and her neighbor, who described the man who raped her, and said they saw him exiting her apartment, run and get into a vehicle, and leave the scene. LF indicated that it was her vehicle, and that the man had stolen it. More officers arrived at the apartment, and Off. Brown left to go search for the vehicle. He found it at a dead end, about a quarter of a mile away from the scene.
Susan McMillan, of the Child Abuse and Sex Crimes Unit of the Monroe Police Department, testified that she responded to a rape on January 26, 2013, at Parish Square Apartments. The victim had already been taken to the hospital upon her arrival. The apartment smelled strongly of bleach. Officer McMillan then went to Saint Francis Hospital and interviewed LF, who related the incident to her. According to Off. McMillan, she had been aware of a prior incident at ULM and had spoken with Detective Booth. The officer noted the description of the suspect and the incident was similar to MB’s incident, in that they both described a tattoo on the neck, the man’s attempt to make small talk with them, and a similar overall physical description of the suspect. Officer McMillan testified that a rape kit was performed, and submitted to the crime lab in Shreveport for DNA analysis. She testified that she showed LF a photo lineup, and LF identified the defendant as the individual who raped her.
IsDominique Johnson testified that he was present at Parish Square Apartments the day of LF’s rape. Johnson saw a man run down the stairs of the apartment, get into a car, and drive away. Johnson also saw a girl he did not know, wrapped in a towel, who said she had been raped by the man driving away. Johnson identified the defendant in the courtroom as the man he saw that day.
Teresa Daniel, a Sexual Assault Nurse Examiner at St. Francis Medical Center, performed a physical examination and pre *837 pared a PERK kit of LF. Daniel said that LF’s clothes had been bleached. During the physical exam, Daniel discovered abrasions and small lacerations on LF’s genitalia.
Dr. Jessica Esparza, the DNA technical leader at the North Louisiana Crime Lab in Shreveport, testified that she is a DNA analyst and is in charge of the scientific integrity of the DNA section at the crime lab. Esparza tested all of the evidence contained in MB’s and LF’s PERK for DNA. The sperm found in the used condom from MB’s PERK was tested and determined to be a match to Terrese Robinson’s DNA. From LF’s PERK, the swab of her external genitalia, Esparza determined the DNA to be a mixture of LF and Terrese Robinson. Dr. Esparza’s findings determined that Robinson’s semen was found on LF.
Victim Three — JR
Dorian Harris, an employee at Pecan-land Mall, testified that on January 30, 2013, an incident occurred at work. Harris spoke with security, because she felt she was being followed. As she was walking through the 19mall on her lunch break, an unknown man asked her for the time, and she responded that she did not have a watch. She kept walking. Harris saw the man again in Forever 21, the store in which she worked. The man asked for her assistance, and told her he was picking out something for his girlfriend. She selected several items for him. The man said he would return later and purchase some things and asked Harris for her phone number. Harris gave him the store phone number. The man asked her when she got off work. He left the store, but waited outside the store in the mall, and remained there for a while. Several of her coworkers noticed, and suggested she call security, because the man could possibly be the “ULM rapist.” Harris identified the defendant in the courtroom as the man in the store with her that day, as well as the man who appeared on security footage of the store from January 30, 2013.
Juliana Henley testified that she was shopping at Pecanland Mall at Forever 21, and an unknown man made a comment at her as she was walking out of the mall. Henley ignored him, and the man turned around and walked toward her. She noticed out of the corner of her eye that he was following her, and he had his hoodie up, so shé sped up toward her car. She got into her car and locked the doors. As she was locking the doors, she looked up, and a man was standing there. The man knocked on the window and pointed to his wrist, as if to ask what time it was. Henley remembered that the man had a tattoo on his hand, but she could not remember what it was. Henley picked out two people from the photo lineup, and could not confirm that the defendant was the man from the mall parking lot.
|1ftHeather Ellis, an employee at Pecan-land Mall, made a complaint to mall security on January 30, 2013. Ellis testified that a man stopped her in the mall and was “sort of harassing” her and made her feel very uncomfortable. Ellis told mall security that the man had a large tattoo on his neck. She identified the defendant in the courtroom as the man who approached her at the mall.
JR testified about the incident that occurred on January 30, 2013, at Pecanland Mall, where she was employed at a store. JR was leaving work to go pick up her daughter from school; she got into her car, a Mitsubishi Eclipse, and was checking her phone. JR looked up and a man was standing there, next to her car. JR initially opened her door to ask him to move, but the man said her tire was flat. JR looked back at her tire and said that it was not flat, and tried to close her door. *838 The man stuck his hand between the door and pulled it open, and told her to move over, that he had a gun. He did not tell her to get out of the car. JR believed that he had a gun, even though she did not see it, so she moved over to the passenger seat. JR was able to unlock and open the passenger door. The man grabbed her by her arm. Another person passed by in the parking lot, and JR was screaming for help — she was fighting and kicking. The assailant yelled out, “That’s just my crazy girlfriend,” and the passerby drove away. JR continued fighting, and was able to get out of the car, in which her assailant sped away. JR called 911 and went back to the mall and spoke with mall security. The Monroe Police Department came to the scene. JR told police she saw tattoos on the man’s neck and hand. The police showed JR a photograph while speaking | nwith her, and she identified the defendant in the photograph as the man who was in her car. Security footage of the incident from the mall showed JR and thé man in her vehicle. JR gave, an official statement to the Monroe Police Department. JR posted' about the incident on her Facebook and Instagram, and she gave an interview to a TV station about the incident. At trial, JR identified the defendant in the courtroom as the man who had been in her car.
Officer Billy Jordan of the Monroe Police Department testified that he was on patrol on January 30, 2013. Officer Jordan responded to a theft of a Mitsubishi Eclipse, and he came upon the vehicle parked in a trailer park. Once the'suspect, who was standing nearby, saw Off. Jordan in his patrol car, he attempted to run away on foot. Officer Jordan testified that the suspect was stopped by police, attempting to jump a fence. The suspect was placed in the back of a police car. The officer identified the defendant in the courtroom as the suspect that he pursued and arrested that day in the trailer park.
Angel Cook, an employee of Allied Barton Security Services, testified that she is a dispatcher and works at Peeanland Mall. On January 30, 2013, a complaint was made by Dorian Harris about a male in the mall. Harris reported being followed through the mall by a man, and that the man was waiting outside of her place of work for her to come out. Cook also received a complaint from Heather Ellis, with the same description of a man she had received from Harris. Cook began to monitor the man on her security cameras. Cook watched the man go outside and follow JR to her |12car; she viewed the entire incident on the security monitor. Cook stated that as it was happening, all she could do was watch and relate what was happening on the radio. Cook contacted the police department as she was watching the surveillance video.
Robert Jones, the safety and security director at Peeanland Mall for Allied Barton Security Services, testified that he received the call from Angel Cook about a harassment complaint which had turned to a possible kidnapping scenario. He made his way toward the direction of the incident, and Jones spoke with the victim, JR, whom he described as very tense and hyper-aware of her surroundings. They spoke for about five minutes before the police arrived.
Officer Aleric Coleman, a patrol officer for the Monroe Police Department, testified that on January 30, 2013, he responded to a carjacking at Peeanland Mall. Officer Coleman spoke with JR about the incident, and he described JR as hysterical.
Officer Randall Pitman, a shift sergeant with the Monroe Police Department, formerly of the violent crimes unit, testified that on January 30, 2013, he investigated *839 an attempting kidnapping and carjacking incident at the mall. While he was speaking with JR, another woman, Harris, approached him and said she believed the unknown man who attacked JR had been in her store, Forever 21, and there would be video footage of his presence. A photograph of the defendant was shown to JR at the mall during this conversation, and she identified the defendant as the man who had entered her car. A photo lineup was shown to Dorian Harris, who also | ^identified the defendant as the man who was in her store. Prior to the defendant being apprehended, Off. Pitman believed the man involved in the mall incident may have been the rape suspect from the two prior incidents in Monroe, based on descriptions of his tattoos from multiple witnesses, and the similar nature of the incidents.
Sergeant Thomas Staten, with the Monroe Police Department serving as detective supervisor, testified that on January 30, 2013, he arrived as backup to á carjacking or kidnapping at the mall. Shortly after leaving the station, he received Sgt. Jordan’s call that he found the stolen vehicle and the suspect and was in pursuit at the Harvester Trailer Park. Sergeant Staten received information that the suspect was running his way, and then heard someone running, saw the suspect, and drew his gun. Sergeant Staten told him to get on the ground, and the suspect complied. Immediately after the incident, Sgt. Staten identified Robinson in a photo lineup. At trial, he identified the defendant in the courtroom as the man he apprehended.
Officer Jeremy Kent, with the Monroe Police Department, was called out to the kidnapping and .carjacking on January 30, 2013. He received a description of the stolen vehicle located in Harvester Trailer Park. Officer Kent was among the police officers who apprehended the suspect and he read Robinson his Miranda rights as he was being arrested. Officer Kent identified the defendant in the courtroom as the man he Mirandized that day. Officer Kent also stated that he had shown MB a photo lineup after the suspect was arrested in the trailer park, and MB positively identified the defendant as the man who had raped her two weeks prior.
114Officer Jeremy Sturdivant, a police officer with the Monroe Police Department, testified that he was called out to the mall to gather witnesses and review surveillance video of that carjacking incident. After the suspect was arrested following the mall incident, Off. Sturdivant showed LF a photo lineup, and she positively identified the defendant as the man who had raped her.
Detective Booth was called again to testify regarding his interview with Terrese Robinson following his arrest in the trailer park. Robinson smelled of alcohol and informed Det. Booth that he had smoked POP earlier that day, but his speech was coherent and he understood his rights. Robinson signed a rights form at the police station. Robinson signed a waiver for search of bodily fluids. According to Det. Booth, Robinson gave a statement regarding the incident, and was not promised a deal in connection with this statement, and was not coerced in any way. Robinson was given food and a change of clothes and was informed of his right to have an attorney, but he waived that right. Robinson informed Det. Booth that he-had smoked POP the morning of the incident, and intended to go to the mall to rob someone to buy more. Robinson denied telling JR he had a gun. Detective Booth then began to question Robinson about the prior rapes in the area, knowing that both MB and LF had picked Robinson out of a photo lineup at the time of the interview. Robinson denied any knowledge about the rapes of *840 MB and LF. During his interview with Robinson, Det. Booth recalled that both MB and LF had given similar descriptions of their attacker, including tattoos on the hand and neck.
11fiOn February 17, 2014, following closing arguments, the jury returned a unanimous verdict of guilty on all counts.
At the subsequent sentencing hearing, the trial court noted having reviewed the PSI report, considered all of the information contained in it, and also considered the case under the guidelines set forth in La. C. Cr. P. art. 894.1. It noted as an aggravating factor that Robinson had an extensive criminal history. But the trial court also considered as a mitigating factor that Robinson had three young children. The trial court also observed Robinson’s significant lifelong substance abuse problem. The trial court determined that Robinson’s conduct in every incident threatened a risk of death or great bodily harm to more than one person. Also observed was that Robinson’s actions were not motivated by any monetary need to fuel a drug problem, because he did not take anything of value from the victims. The trial court concluded that Robinson’s usage of PCP did not have anything to do with these crimes, and he apparently assaulted his female victims for his own gratification. The trial court noted that due to the fact that Robinson approached multiple women and attacked three of them, this criminal activity would be likely to continue.
The trial judged sentenced Robinson to the maximum sentence on all counts as follows:
• On Count One, second degree kidnapping of MB, a violation of La. R.S. 14:44.1, 40 years at hard labor without benefits;
• On Count Two, aggravated rape of MB, a violation of La. R.S. 14:42, life at hard labor without benefits;
|i6* On Count Three, aggravated rape of LF, a violation of La. R.S. 14:42, life at hard labor without benefits;
• On Count Four, felony theft of LF’s automobile valued at over $1,500, in violation of La. R.S. 14:67, 10 years at hard labor;
• On Count Five, attempted second degree kidnapping of JR, in violation of La. R.S. 14:27 and La. R.S. 14:44.1, 20 years at hard labor without benefits; and,
• On Count Six, carjacking JR’s vehicle, a violation of La. R.S. 14:64.2, 20 years at hard labor without benefits.
The sentences for each victim were to run concurrently with each other, but consecutively to the sentences of the other victims. The overall result of sentences was two consecutive life sentences, plus a consecutive 20 years. In addition, and in accordance with La. R.S. 15:571.3, the trial court denied Robinson’s eligibility for diminution of sentence for good behavior. Robinson did not file a motion to reconsider sentence.
A request for an appeal in this proceeding was filed and granted.
Discussion
In his first assignment of error, Robinson argues pro se that the evidence was insufficient to sustain his convictions for aggravated rape (2 counts), second degree kidnapping, attempted second degree kidnapping, felony theft of an automobile, and carjacking. Specifically, he maintains that: no seminal fluid was discovered in any of 'the victims; the identification of him from the photographic lineup shown by the police and the DA casts doubt upon the reliability of that identification, arguing that 117his picture was the only photo of the six in the lineup with a “light blue background”; “no weapon or evidence was produced to show any of the victims were *841 injured”; and, he was prejudiced by an electronic newspaper article shown on a local website. We disagree.
When issues are raised on appeal, both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proven beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App.2d Cir.04/02/97), 691 So.2d 347, unit denied, 1997-1203 (La.10/17/97), 701 So.2d 1333.
Under the Jackson v. Virginia standard, we review the record in the light most favorable to the prosecution to determine whether the evidence was sufficient to convince any rational trier of fact that all the essential elements of the crime had been proven beyond a reasonable doubt. Jackson v. Virginia, supra; State v. Tate, 2001-1658 (La.05/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 2005-0477 (La.02/22/06), 922 So.2d 517.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Parker, 42,311 (La.App.2d Cir.08/15/07), 963 So.2d 497, writ denied, 2007-2053 (La.03/07/08), 977 So.2d 896.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Banks, 48,868 (La.App.2d Cir.02/26/14), 134 So.3d 1235, writ denied, 2014-0671 (La.12/08/14), 153 So.3d 432. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 1994-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App.2d Cir.08/30/02), 827 So.2d 508, writ denied, 2002-3090 (La.11/14/03), 858 So.2d 422.
| inThe trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Casey, 1999-0023 (La.01/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000). Credibility determinations are the province of the trier of fact. State v. Johnson, 38,927 (La.App.2d Cir.11/23/04), 887 So.2d 751.
*842 The likelihood of misidentification violates due process when the totality of the circumstances indicates that mis-identification probably occurred. State v. Brown, 40,769 (La.App.2d Cir.03/08/06), 923 So.2d 976, citing Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). For an in-court identification to be suppressed due to an allegedly suggestive identification procedure, there must be a substantial likelihood of misidentification in addition to the suggestive identification procedure. Id. When assessing the reliability of an identification, the following factors must be considered: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness’s degree of attention; (3) the accuracy of his or her prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the length of time between the crime and the confrontation. State v. Kemp, 39,358 (La.App.2d Cir.03/11/05), 896 So.2d 349, 356, writ denied, 2005-0937 (La.12/09/05), 916 So.2d 1052, citing Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). Further, evidence of the witness’s | gnpretrial identification of the defendant enhances the credibility of that witness’s in-court identification. State v. Tilmon, 38,003 (La.App.2d Cir.04/14/04), 870 So.2d 607, writ denied, 2004-2011 (La. 12/17/04), 888 So.2d 866.
Here, Robinson’s claim regarding the lack of seminal fluid inside either victim would not negate the establishment of essential elements of aggravated rape. Because the trier of fact accepted the expert’s testimony as true that Robinson’s DNA was found on both victims, and the other elements of the crime of aggravated rape were established by the testimony of the victims themselves, this court should not impinge on that determination by the trier of fact.
The likelihood of misidentification violates due process when the totality of the circumstances indicates that misidentification probably occurred. In the case sub judice, there is an overwhelming amount of identification evidence, aside from the photographic lineups, from numerous witnesses, identifying' the defendant as the man involved in the crimes charged. The would-be victims, as well as the actual victims, clearly described and identified Robinson — including his easily identifiable tattoos.
Moreover, even with the lack of any seminal fluid on the victims, the factfinder would be free to consider the testimony of the victims regarding the attacks as well as the various witnesses regarding the victims’ behavior after their attacks. It would be within the jury’s province to consider the | ⅞,veracity of those witnesses and to form a conclusion from that evidence. In this case, after a careful review of the record and considering the evidence, the jury’s finding was not in error.

Pretrial Motion to Sever

In his first assignment of error (brought by his appeal counsel) Robinson argues that trying all of the crimes lodged against him was error, because it caused the jury to infer a criminal disposition on Robinson’s part. In Robinson’s opinion, the nature of the charges, tried together, caused the jury to be hostile. Again, we disagree.
The trial court considered Robinson’s motion to sever offenses at a pretrial hearing. At the hearing, the subject of amending the indictment was addressed initially. The indictment was amended to group the charges as to each victim. The trial court determined that the joinder of felony theft to the aggravated rape charge of LF was permissible, pursuant to La. C. Cr. P. art. 493.2. Then, the motion to sever was considered. The state set forth facts and *843 circumstances alleged as to each victim, and defense counsel argued for three separate trials, one trial per each victim. The state set forth a summary of the facts surrounding the incident involving each victim, MB, LF, and JR. A summary of the DNA evidence for each rape victim was also made by the state. Robinson argued that he would not have a fair trial if all of the offenses were tried together and also asserted that there was no dis-cernable modus operandi He finally argued that if the trials were severed, evidence of the other crimes would not be admissible under La. C.E. art. 404(B). •
__kgThe next day, the trial court denied the motion to sever, explaining that after conducting research on the issue, jurisprudence supported a trial of the offenses based on the summary of the facts and circumstances. The trial court noted factual similarities between the crimes, and said an argument could be made that these constituted “signature crimes.” The trial court’s reasons for judgment were that in the event of a severance of these offenses for trial, evidence of them as other crimes would be admissible under La, C.E. art. 404(B), because they constitute same or similar acts. The policy of judicial economy and efficiency would not be fostered in the event of a severance. The trial court was mindful of potential prejudice, but because the crimes would be properly admissible as 404(B) evidence, he did not find unfair prejudice would result from a denial of the severance, and the trial court would take protective measures to prevent actual prejudice. Robinson made an objection to the trial court’s ruling.
Louisiana C. Cr. P. art. 493 provides:
Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan; provided that the offenses joined must be triable by the same mode of trial.
Louisiana C. Cr. P. art. 495.1 provides: If it appears that a defendant or the state is prejudiced by a joinder of offenses in an indictment or bill of information or by such joinder for trial together, the court may order separate trials, grant a severance of offenses, or provide whatever other relief justice requires.
 Whether justice requires a severance must be determined by the facts of each case. State v. Prudholm, 446 So.2d 729, 741 (La.1984). To determine whether severance should be granted, the trial court must decide whether, in view of the number of offenses charged and the complexity of the evidence, the finder of fact can distinguish the evidence and apply the law intelligently to each offense. State v. Coleman, 369 So.2d 1286 (La.1979).
The trial court is required to weigh the possibility of prejudice to the defendant against the important consideration of economical and expedient use of judicial resources. State v. Brooks, 541 So.2d 801 (La.1989). Evidence of other crimes should not be admissible to create the inference that the accused is a bad person, or committed one act because he committed another. State v. Lewis, 358 So.2d 1285 (La.1978).
A defendant has a heavy bur-' den of proof when he alleges prejudicial joinder of offenses. State v. Machon, 410 So.2d 1065 (La.1982); State v. Smith, 600 So.2d 745 (La.App.2d Cir.05/13/92). A motion to sever is within the sound discretion of the trial court, and the court’s ruling *844 should not be disturbed on appeal absent a showing of an abuse of discretion. State v. Williams, 418 So.2d 562, 564 (La.1982).
As noted in State v. Washington, 386 So.2d 1368, 1371 (La.1980), a court should consider the following in determining whether the joinder will be prejudicial:
1. Whether the jury would be confused by the various counts;
|¾42. Whether the jury would be able to segregate the various charges and evidence;
3. Whether the defendant would be confounded in presenting his various defenses;
4. Whether the crimes charged would be used by the jury to infer a criminal disposition; and
5. Whether, especially considering the nature of the. charges, the charging of several crimes would make the jury hostile.
Here, we do not believe the trial court abused its discretion by denying the motion to sever the offenses. The economical and expedient use of judicial resources outweighed the potential for prejudice in this case. Due to the high number of witnesses, the closeness in time and proximity of the three crimes, and the similar modus operandi of the defendant — which was established through concrete evidence (including DNA evidence and eyewitness accounts) — the denial of the motion to sever was not error and there was no clear abuse of discretion. The trial judge gave comprehensive reasons for the denial of the motion to sever at the hearing prior to trial, which we believe were well reasoned and legally valid. Therefore, this assignment of error is without merit.

Excessive Sentence

In his third assignment of error, Robinson argues that the maximum allowable sentence for all charges violates his constitutional right against excessive sentences. He argues specifically that the consecutive sentences imposed were unduly harsh and excessive, and that the trial court failed to state the factors considered and reasons for consecutive terms. We disagree.
 Appellate review of sentences for excessiveness when no motion to reconsider sentence was filed is limited to a consideration of whether the sentence imposed is unduly harsh or excessive. A sentence violates La. Const. Art. I § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993). A sentence is grossly disproportionate if, when the crime and punishment are viewed in light of the harm to society, it shocks the sense of justice. State v. Weaver, 2001-0467 (La.01/15/02), 805 So.2d 166.
The trial court is given wide discretion in the imposition of sentences within the statutory limits. The sentence imposed will not be set aside as excessive absent a manifest abuse of that discretion. State v. Williams, 2003-3514 (La.12/13/04), 893 So.2d 7; State v. Diaz, 46,750 (La.App.2d Cir.12/14/11), 81 So.3d 228. On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. State v. Williams, supra; State v. Free, 46,894 (La.App.2d Cir.01/25/12), 86 So.3d 29.
 When two or more convictions arise from the same act or transaction, or constitute parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that' some or all be served consecutively. La. C. Cr. P. art. 883. Concurrent sentences arising out of a single course of conduct are not mandatory. *845 State v. Derry, 516 So.2d 1284 (La.App. 2d Cir.1987), writ denied, 521 So.2d 1168 (La.1988). It is within a trial court’s discretion to order sentences to run ^consecutively rather than concurrently. State v. Johnson, 42,323 (La.App.2d Cir.08/15/07), 962 So.2d 1126.
A judgment directing that sentences arising from a single course of conduct be served consecutively requires particular justification from the evidence or record. When consecutive sentences are imposed, the court shall state the factors considered and its reasons for the consecutive terms. State v. Johnson, supra; State v. Boudreaux, 41,660 (La.App.2d Cir.12/13/06), 945 So.2d 898, writ denied, 2007-0058 (La.11/02/07), 966 So.2d 591.
Among the factors to be considered are the defendant’s criminal history (State v. Ortego, 382 So.2d 921 (La.1980), cert. denied, 449 U.S. 848, 101 S.Ct. 135, 66 L.Ed.2d 58 (1980)); the gravity or dangerousness of the offense (State v. Adams, 493 So.2d 835 (La.App. 2d Cir.1986), writ denied, 496 So.2d 355 (La.1986)); the viciousness of the crimes (State v. Clark, 499 So.2d 332 (La.App. 4th Cir.1986)); the harm done to the victims (State v. Lewis, 430 So.2d 1286 (La.App. 1st Cir.1983), writ denied, 435 So.2d 433 (La.1983)); whether the defendant constitutes an unusual risk of danger to the public (State v. Jett, 419 So.2d 844 (La.1982)); the potential for defendant’s rehabilitation (State v. Sherer, 437 So.2d 276 (La.1983); State v. Lighten, 516 So.2d 1266 (La.App. 2d Cir.1987)); and, whether defendant has received a benefit from a plea bargain (State v. Jett, supra; State v. Adams, supra.)
The failure to articulate specific reasons for consecutive sentences does not require remand if the record provides an adequate factual basis to support consecutive sentences. See State v. Boudreaux, supra.
The trial court’s sentence was proper and does not constitute unduly harsh or excessive punishment. It is clear from the record that the trial judge considered aggravating and mitigating factors, in accordance with La. C. Cr. P. art. 894.1. The trial judge explained his reasons for sentencing at the hearing. Moreover, the life sentences for the rape charges were mandated by statute. The sentences for the other offenses were within the statutory limits, and the trial judge has wide sentencing discretion within the statutory requirements. Further, the choice to impose sentences consecutively as to the victims was also within the trial court’s broad discretion and was justified by the facts and circumstances of the three separate incidents. Robinson’s acts against the victims were premeditated and reprehensible. He preyed upon his actual victims and would-be victims in a consistent and thought-out fashion. We should not disturb the trial court’s determination of the sentence, since it was within the statutory mandates and it is not grossly out of proportion to the seriousness of the offense, and is not a purposeless infliction of pain and suffering. This assignment of error is without merit.

Ineffective Assistance of Counsel

Finally, in a fourth assignment of error, which Robinson brings pro se, he argues that his trial counsel was' ineffective for failing to retain a I^DNA expert, failing to challenge the chain of custody, and failing to object to the validity of the DNA test methodology.
As a general rule, a claim of ineffective assistance of counsel is more properly raised in an application for post conviction relief (“PCR”) in the trial court than by appeal. This is because PCR creates the opportunity for a full evidentia-ry hearing under La. C. Cr. P. art. 930. State ex rel. Bailey v. City of West Mon *846 roe, 418 So.2d 570 (La.1982); State v. Ellis, 42,520 (La.App.2d Cir.09/26/07), 966 So.2d. 139, writ denied, 2007-2190 (La.04/04/08), 978 So.2d 325. A motion for new trial is also an accepted vehicle by which to raise such a claim. Id. When the record is sufficient, this issue may be resolved on direct appeal in the interest of judicial economy. State v. Ratcliff, 416 So.2d 528 (La.1982); State v. Willars, 27,394 (La.App.2d Cir.09/27/95), 661 So.2d 673.
A claim of ineffectiveness of counsel is analyzed under the two-prong test developed in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish that his attorney was ineffective, the defendant first must show that counsel’s performance was deficient. Second, the defendant must show that counsel’s deficient performance prejudiced his defense.
Although an ineffective assistance of counsel claim is more properly reserved for an application for PCR, the record is sufficient in this case to show that Robinson’s claim is without merit. He has failed to show that his trial counsel’s failure to make this objection to the validity and methodology of DNA testing in any way prejudiced his defense. The results of untested |;)9DNA evidence would not have affected the outcome of Robinson’s trial, considering the multitude of witnesses, the strength and credibility of their testimony, and the similarity of the attacks. Therefore, this claim is without merit.
Conclusion
For the foregoing reasons, the convictions and sentences of Terrese Latron Robinson are affirmed.
AFFIRMED.

. There are different spellings of the defendant’s first name throughout these proceedings. However, we are using the version used in the trial court proceedings.