Judgment rendered April 10, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 55,514-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

JAMES L. TABB                               Appellant

* * * * *

Appealed from the
Fifth Judicial District Court for the
Parish of Richland, Louisiana
Trial Court No. F-2018-216

Honorable William Barham, Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for Appellant
By: Peggy J. Sullivan

JAMES L. TABB                        Pro Se

PENNY WISE DOUCIERE                  Counsel for Appellee
District Attorney

AMANDA MICHELE WILKINS
KENNETH DOUGLAS WHEELER
Assistant District Attorney

* * * * *

Before COX, ROBINSON, and MARCOTTE, JJ.

MARCOTTE, J.

This criminal appeal arises from the Fifth Judicial District Court, Parish of Richland, the Honorable William Barham presiding. Defendant, James L. Tabb, was convicted of one count of attempted second-degree murder, one count of aggravated burglary, and one count of attempted armed robbery. Tabb was sentenced to 50 years at hard labor for the attempted second-degree murder conviction, 15 years at hard labor for the aggravated burglary conviction, and 49 years at hard labor for the attempted armed robbery conviction. The trial court ordered all sentences to run consecutively. Tabb now appeals. For the following reasons, we affirm defendant's convictions and sentences.

## FACTS AND PROCEDURAL HISTORY

On September 27, 2018, Tabb was charged by bill of indictment with attempted second-degree murder of Josh Butler in violation of La. R.S. 14:27 & 14:30.1, aggravated burglary of Josh and Alicia Butler in violation of La. R.S. 14:60, and attempted armed robbery of Josh and Alicia Butler in violation of La. R.S. 14:27 & 14:64. All offenses were alleged to have occurred on August 9, 2018. Over the next four years, Tabb changed counsel twice and numerous motions were tried at several hearings with trial finally commencing on August 29, 2022, where the following evidence was adduced.

Josh and Alicia Butler lived with their young son on Highway 425 a few miles south of Rayville, Louisiana. Josh worked an international offshore job which required him to be overseas part of the time, and Alicia was a homemaker. In April 2018, after a search on Facebook Marketplace, the Butlers hired Tabb to build a workshop on their property to give Josh a

devoted space of his own. Tabb told the Butlers that the total cost of the project would be $13,000, that he needed $6,000 up front to begin, and that he could be finished in 60 days. The Butlers paid Tabb $6,000 on April 20, 2018.

While Josh was working overseas, he instructed Alicia to pay Tabb an additional $5,000, which Tabb said he needed for supplies and concrete. However, by the end of July 2018, Tabb had not yet started the project. The Butlers then informed Tabb that if he could not start the project, they would have to hire someone else. By early August 2018, Tabb still had not started the project and the Butlers told him they would be reporting him to the authorities if he did not return their money.

On August 8, 2018, the Butlers spoke with Tabb about returning their $11,000. He claimed to be in Arkansas but said that he would leave the money in their mailbox later that night. The next morning, on August 9, 2018, the Butlers awoke at 5:00 a.m. and Josh checked their mailbox, but did not find any money. Alicia then sent a text message to Tabb warning him that they would go to the sheriff's office if he did not meet them at a local bank with their money.

At 5:55 a.m., Tabb finally replied and told the Butlers to check their mailbox again. Josh immediately went outside and walked down the driveway toward their mailbox. As he was walking down the driveway, he heard a sound like "pssssst," and felt something sharp hit him in his back which brought him to his knees. Josh heard someone say "Shit!" and turned to see Tabb running toward him from his left. When Josh tried to stand up, Tabb hit him with a knife in the back of his head and about his face. Josh described to the jury what happened next:

2

A: The next thing I know is he's over there asking me "Shut up" because I kept on asking him "Why are you doing this?" "Shut up. Where's the money? Where's the money? Where's your safe? What's the combination to the safe?" And – and the whole time I said "Why are you doing this? Why?" "I want you to die." And that was – and that's all I can remember after that.

Q: The James Tabb you saw behind the – beside the tree, was it the same James Tabb you had met with previously?

A: Yes, it was.

Q: Any doubt in your mind?

A: No doubt in my mind. That is the last memory I have. I can never see my son again. I can never see my wife again.

Q: Okay. The last...

A: That man has destroyed my life.

As a result of Tabb's vicious attack, Josh suffered multiple stab wounds, both eyes were destroyed and both ears were punctured. He is now blind, sustained brain damage, has a metal plate in his head, and is unable to find a job.

While Josh was outside being attacked, Alicia was inside and their son was sleeping in his bedroom. A person entered the front door whom she identified as a black male with a bandana around his face, carrying a shotgun in his right hand. The man demanded money and to be taken to a safe.

Alicia, knowing nothing about a safe but wanting to direct the intruder out of her house and away from her son, told the man that the safe was in the garage. Once in the garage, the intruder quickly discovered that there was no safe and no money, so he grabbed her by the hair and dragged her outside. He then grabbed her mouth to silence her screams, shoved her down on the grass and began unzipping his shorts. The intruder then pulled out his penis with the

gun pointed at her head. He was already wearing a condom and ordered Alicia to perform oral sex.

At some point, sensing that the intruder was distracted, Alicia got up and began to run and scream for her husband. However, the man hit her in the back of the head, causing her to fall, breaking her tooth and glasses in the process. The man then got up behind her, pulled down her underwear, stuck his penis inside her and tried to rape her, but could not stay erect. He then shoved his fingers against her genitals before giving up and walking back down the driveway toward the street.

Alicia ran back into the house to call 911, but still had no idea where her husband was or what had happened to him. Alicia's 911 call was played for the jury.

At 6:09 a.m., the Richland Parish Sheriff's Office ("RPSO") received Alicia's 911 call and dispatched officers to the scene. Lieutenant John Flowers ("Lt. Flowers") was one of the first officers to arrive and saw a man lying face down in the Butlers' driveway covered in blood. Lt. Flowers initially believed the man was dead until he saw him move slightly. Lt. Flowers described Josh's face and body as a "bloody mess." He also confirmed seeing a bow release at the scene, which he found "very odd."

Josh was transported by ambulance to Richardson Medical Center and later airlifted in critical condition to the trauma center at LSU-Shreveport after the bleeding in his brain was stabilized. In addition to the deep lacerations on his back and scalp and being stabbed in the eyes and ears, Josh also had a single, large, gaping star-

4

shaped wound on his lower back which was different in nature from the multiple other stab wounds on his body. The emergency room physician confirmed that this wound could have been caused by an arrowhead tip.

Prior to the attempted murder and assault of the Butlers, Terrance Miles ("Terrance") and Tabb spent the night and early morning hours buying liquor at Wal-Mart, playing cards, partying, and having sex or trying to have sex with different women. Terrance testified that he saw both a gun and a compound bow in Tabb's truck when he was with him on August 8, 2018. Tabb told Terrance that he was going to call Josh and try to kill him.

Terrance saw Josh come out of the residence and witnessed Tabb shoot Josh with the bow and arrow and then get on top of Josh, "hitting" him with a knife, and slamming his head into a concrete culvert on the driveway. Terrance confirmed that he used Tabb's shotgun to attempt to burgle the Butler residence and that after he assaulted and raped Alicia, he went back to Tabb's truck.

In a separate proceeding, Terrance agreed to plead guilty to second-degree rape and attempted armed robbery, reduced from aggravated burglary and attempted first-degree rape. The only agreement of record was that the sentence would be subject to a 35-year cap. Terrance's plea agreement with the state was read into the record and published to the jury.

On cross-examination, Terrance admitted that he initially lied to police because he was scared and didn't want to go to jail. Terrance also admitted that the gun he used that morning did not look like the

picture of the gun in evidence. Contradicting the testimony of Alicia, Terrance denied hitting her and testified that he did not attempt to rape her but rather coerced her into starting oral sex.

Donnie Miles ("Donnie"), Terrance's uncle, testified that at around 6:00 a.m. on August 9, 2018, Tabb arrived at his house with Terrance to pick Donnie up for work. Donnie told the jury that such an early time was unusual since Tabb normally picked him up around 9:00 a.m. Donnie saw blood on Tabb's arm and on the door of his truck, and when Donnie asked him where it came from, Tabb told him "I think I – I done killed a man." Donnie also saw him wiping blood off the driver's side door. On cross-examination, Donnie said he initially told police that Tabb told him "I hope I didn't kill him."

When they arrived at the construction work site in Bastrop, Louisiana, Donnie noticed a tactical type 12-gauge shotgun in the back of Tabb's truck. Donnie remarked that it was unusual for a gun to be there. Tabb agreed and told him to move the gun and put it behind his seat. Donnie complied. Tabb then said he needed to make a quick trip to the store alone. When Tabb returned, Donnie went to retrieve his cigarettes from the truck, and the gun was gone.

RPSO Investigator Tyler Wade, who was a deputy at the time the offenses were committed, testified that when he arrived at the crime scene he searched for evidence and helped secure the perimeter. Investigator Wade found the compound bow release in the area near Josh's body and also obtained key timeline videos for the hours preceding and immediately following the crimes, including a Wal-Mart surveillance video showing Tabb and Terrance entering the

6

Rayville store at 1:29 a.m., a Circle-K surveillance video placing Tabb only a few miles from the Butler residence at 5:21 a.m., and a video from the First Baptist Church, located a few miles from the Butler residence, showing Tabb's truck pass by at 6:29 a.m.

RPSO Captain Jerry Spencer, Jr. ("Capt. Spencer"), who worked with the Louisiana State Police at the time of the crimes, assisted in the crime scene investigation and traveled to Bastrop to locate and arrest Tabb later that morning. Capt. Spencer also helped secure Tabb's white truck. In processing Tabb's truck, he found blood on the driver's side door and the back portion of the steering wheel.

Swabs were taken from the areas of the truck that contained suspected blood and Deputy Jeremy Redding testified that in those areas, the truck appeared wiped down and that there was a strong chemical smell inside the cab of the truck. Investigators also retrieved a knife and two shotgun shells from Tabb's truck. A headlamp was also found by the crime scene investigators in the area where the bow release was recovered and where they found Josh.

Investigators interviewed Tabb and he denied any involvement, telling them that he was in Bastrop at 6:00 a.m. that morning, which would have been at the time the crimes were committed.

The state called Michael Fegley as an expert witness in geolocation analysis and he was accepted as an expert. Mr. Fegley used the phone records and data provided by AT&T to map the journey taken by Tabb's phone on August 9, 2018. Mr. Fegley showed the cell towers that Tabb's phone was communicating with,

including a tower in Rayville, Louisiana, less than an hour before the attack on the Butlers, a tower just south of the Butler residence when Tabb texted the Butlers to check their mailbox minutes before the attempted murder, and towers heading north through Rayville toward Bastrop as Tabb picked up Donnie and drove to the work site in Bastrop.

On cross-examination, Mr. Fegley admitted that the phone records carried a warning to "exercise caution" in using the records, "as location data sorts from various data bases, which may cause location results to be less than accurate." Mr. Fegley further admitted on cross-examination that the records allowed him to estimate the location of Tabb's phone, rather than to place it in a specific location at a specific time.

The defense presented its own expert witness, David Burgess, who was accepted as an expert in the field of geolocation of cellular devices. Mr. Burgess testified that as many as nine cell towers were used by Tabb's phone on the morning of this incident and that there is no way to conclusively say which tower was used at any given time. Mr. Burgess further testified that "everything presented [by Mr. Fegley] was also speculation."

Tammy Rash ("Ms. Rash"), the technical reviewer for the November 2018 DNA forensic analysis report, testified regarding the match for the blood found on the inside door handle of Tabb's truck to Josh's DNA swab. Ms. Rash served as the administrative reviewer on the February 2020 DNA forensic analysis report and testified about

finding Josh's DNA on the bow release, the exterior of the head lamp, and batteries.

Paul Berry, Director of the Louisiana State Police Crime Lab's DNA Section, testified that if the testing analyst was no longer working at the lab and available to testify at trial, then it would be standard procedure for the analyst who technically reviewed the case to testify regarding the results of the analysis since they also would have reviewed the data, testing procedure, and results.

Julia Naylor was qualified as an expert witness in the area of forensic DNA analysis including the TrueAllele system at a June 1, 2022, pretrial hearing. She testified at trial about the TrueAllele analysis that she performed on the forensic data from the bow release. Her analysis confirmed the match of Josh as the main DNA contributor and Tabb as a minor DNA contributor.

Tabb bought the firearm and the compound bow from a pawn shop in West Monroe in 2017. Evidence of the purchases was introduced through a former employee who worked at the store at that time.

West Carroll Parish Sheriff Scott Matthews ("Sheriff Matthews"), who spent 28 years with the Louisiana Department of Wildlife and Fisheries, testified as an expert in the use and function of compound bows. Sheriff Matthews identified the bow release found at the crime scene as the type of release used for a compound bow. He also confirmed that there was no other use for a bow release and that the distance from where the bow release was found and where Josh was shot would have been a "chip shot" for the bow user.

9

Sheriff Matthews explained that the accuracy of an arrow shot from a compound bow can be impacted if the proper technique is not used or if the target is moving. In such cases, he said, the shot may not penetrate the target.

In his closing argument, the state's prosecutor made the following statements:

1. "You saw evidence of DNA that put the victim's DNA in James Tabb's truck."

2. "I imagined what [Alicia] was going through, having an AR15, AK47, or a tactical shotgun pointed at my head I don't know that I'd be able to tell you exactly what it was."

3. "I'm not sure I really understood everything [Mr. Burgess] said and he never did a report."

4. "The telephone tower is right here, ladies and gentlemen, here's the Butlers' house. The cell phone – that tower that's connecting to it is right here."

On September 9, 2022, the case was submitted to the jury and after approximately two hours the jury returned unanimous convictions against Tabb for one count of attempted second-degree murder, one count of the responsive verdict of attempted aggravated burglary, and one count of attempted armed robbery.

A presentence investigation was ordered and the report was submitted to the trial court and filed under seal at a sentencing hearing on November 2, 2022. After reading the report, victim impact statements, and letters in support of Tabb into the record, the trial court sentenced Tabb to 50 years at hard labor for the attempted second-degree murder conviction, 15 years at hard labor for the attempted aggravated burglary conviction, and 49 years at hard labor for the attempted armed robbery conviction, with all sentences to run

10

consecutively and credit for time served. The trial court failed to restrict benefits for Tabb's attempted second-degree murder and attempted armed robbery convictions.

Tabb was given notice of his appellate and post-conviction relief time limits. His trial counsel lodged a general objection to the sentence but no motion to reconsider his sentences was filed. Tabb now appeals.

**DISCUSSION**

*Excessive Sentence*

For his first counseled assignment of error, Tabb argues that his consecutive sentences totaling 114 years are excessive, especially considering that he only engaged in one course of criminal conduct and that two of the three counts were committed solely by his codefendant. Tabb argues that the trial court should have given more consideration to his lack of criminal history and the fact that he was working as a fire captain and in construction at the time of the incident. He claims that he is not among the worst class of offenders, and thus should not have been given near maximum sentences for each conviction. Tabb further claims that the trial court did not provide sufficient justification to order that his sentences run consecutively rather than concurrently.

The state argues that Tabb is barred on appeal from attacking the consecutive nature of his sentences since he failed to urge any specific objections to his sentences and failed to file a written motion to reconsider them. Notwithstanding the fact that Tabb failed to preserve his right to have the sentences reviewed on appeal, the state

11

argues that the trial court was well within its discretion in imposing consecutive sentences because the trial court conducted a thorough analysis of the relevant factors under La. C. Cr. P. art. 894.1.

La. C. Cr. P. art. 881.1(E) provides as follows:

Failure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the state or the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review.

Under this article, a defendant must set forth the specific grounds upon which the motion is based in order to raise an objection to the sentence on appeal. *State v. Woods*, 49,031 (La. App. 2 Cir. 5/14/14), 139 So. 3d 1085, *writ denied*, 14-1130 (La. 1/9/15), 157 So. 3d 597. If the defendant does not allege any specific ground for excessiveness or present any argument or evidence not previously considered by the court at original sentencing, then the defendant does not lose the right to appeal the sentence, he is simply relegated to having the appellate court consider the bare claim of excessiveness. *State v. Humphries*, 48,235 (La. App. 2 Cir. 9/25/13), 124 So. 3d 1177.

To constitute an excessive sentence, a reviewing court must find that the penalty is so grossly disproportionate to the severity of the crime as to shock the sense of justice or that the sentence makes no reasonable contribution to acceptable penal goals and, therefore, is nothing more than the needless imposition of pain and suffering. *State v. Griffin*, 14-1214 (La. 10/14/15), 180 So. 3d 1262. The trial court has wide discretion in the imposition of sentences within the

statutory limits and such sentences should not be set aside as excessive in the absence of a manifest abuse of that discretion. *State v. Williams*, 03-3514 (La. 12/13/04), 893 So. 2d 7. On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. *Id.; State v. Fontenot*, 51,072 (La. App. 2 Cir. 1/11/17), 211 So. 3d 1236.

La. C. Cr. P. art. 883, relating to concurrent and consecutive sentences, provides in pertinent part:

> If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. Other sentences of imprisonment shall be served consecutively unless the court expressly directs that some or all of them be served concurrently.

Concurrent sentences arising out of a single course of conduct are not mandatory, and consecutive sentences under those circumstances are not necessarily excessive. *State v. Nixon*, 51,319 (La. App. 2 Cir. 5/19/17), 222 So. 3d 123, *writ denied*, 17-0966 (La. 4/27/18), 239 So. 3d 836; *State v. Scott*, 50,920 (La. App. 2 Cir. 11/16/16), 209 So. 3d 248, *writ denied*, 17-0353 (La. 11/13/17), 229 So. 3d 478; *State v. Hebert*, 50,163 (La. App. 2 Cir. 11/18/15), 181 So. 3d 795. It is within the court's discretion to make sentences consecutive rather than concurrent. *State v. Nixon, supra; State v. Robinson*, 49,677 (La. App. 2 Cir. 4/15/15), 163 So. 3d 829, *writ denied*, 15-0924 (La. 4/15/16), 191 So. 3d 1034.

A judgment directing that sentences arising from a single course of conduct be served consecutively requires particular

justification from the evidence or record. *State v. Nixon, supra.* When a sentencing court directs that multiple sentences arising from a single course of conduct be served consecutively, the sentencing court is required to state the factors considered and its reasons for the consecutive sentences. *State v. Craft*, 49,731 (La. App. 2 Cir. 2/26/15), 162 So. 3d 539, *writ denied*, 15-0544 (La. 1/25/16), 184 So. 3d 1288. The factors to be considered include: (1) the defendant's criminal history; (2) the gravity or dangerousness of the offense; (3) the viciousness of the crimes; (4) the harm done to the victims; (5) whether the defendant constitutes an unusual risk of danger to the public; (6) the potential for the defendant's rehabilitation; and (7) whether the defendant received a benefit as part of a plea bargain. *Id.*; *State v. Baker*, 49,175 (La. App. 2 Cir. 8/27/14), 148 So. 3d 217.

However, the sentencing court's failure to articulate specific reasons for consecutive sentences does not require remand if the record provides an adequate factual basis to support consecutive sentences. *State v. Nixon, supra; State v. Boudreaux*, 41,660 (La. App. 2 Cir. 12/13/06), 945 So. 2d 898, *writ denied*, 07-0058 (La. 11/2/07), 966 So. 2d 591. A trial judge is in the best position to consider the aggravating and mitigating circumstances of a particular case, and, therefore, is given broad discretion in sentencing. *State v. Dale*, 53,736 (La. App. 2 Cir. 1/13/21), 309 So. 3d 1031.

The maximum and minimum sentences for attempted second-degree murder are found under La. R.S. 14:27 & 14:30.1. The sentencing range for attempted murder is 10 to 50 years at hard labor without benefit of probation, parole, or suspension of sentence.

14

Tabb's sentence of 50 years at hard labor fell within the statutory limits for that crime.

The maximum and minimum sentences for attempted aggravated burglary are found under La. R.S. 14:27 & 14:60. The sentencing range for attempted aggravated burglary is six months to 15 years at hard labor. Tabb's sentence of 15 years at hard labor fell within the statutory limits for that crime.

The maximum and minimum sentences for attempted armed robbery are found under La. R.S. 14:27 & 14:64. The sentencing range for attempted armed robbery is zero to 49½ years without benefit of probation, parole, or suspension of sentence. Tabb's sentence of 49 years at hard labor fell within the statutory limits for that crime.

In addition to sentencing Tabb within the statutory limits for each crime, the trial court fully articulated the art. 894.1 factors, noting the particularly gruesome nature of his crimes. The trial court also fully justified its reasons for ordering the sentences to run consecutively. The court considered the PSI report, powerful and moving victim impact statements from Josh and Alicia, and letters in support of Tabb.

Tabb, despite his previous career and standing before this offense, committed and took part in a particularly heinous crime in which he and his codefendant lured Butler from his home and attacked him, leaving him permanently disabled. Tabb's actions have devastated a family and the trial court's sentence properly held him accountable. This assignment of error is without merit.

15

*Geolocation*

In his second counseled assignment of error, Tabb argues that cell phone geolocation was erroneously allowed to suggest his precise locations, when in fact there is no basis for finding pinpoint locations of a cell phone by historical data. Tabb avers that the AT&T records could not provide any "specific location" where he was at any time, and that the records arrived with a warning that the data should not be used as it was in this case.

The state argues that the geolocation data from Tabb's cell phone was not erroneously admitted or applied. The state notes that Louisiana courts have been qualifying and accepting the use of cell phone data for geographical analysis evidence for several years, and that appellate courts have long recognized this evidence as sufficient to uphold convictions. The state further points out that the jury simply found its expert on cell phone geolocation to be more credible than Tabb's expert on that issue, and there is no trial court error.

Louisiana courts have qualified and accepted the use of cell phone data for geographical analysis evidence for several years and appellate courts have recognized this evidence as sufficient to uphold convictions. For instance, in *State v. Davis*, 13-275 (La. App. 3 Cir. 10/23/13), 129 So. 3d 554, *writ denied*, 14-0010 (La. 6/13/14), 140 So. 3d 1186, *cert. denied*, 574 U.S. 1014, 135 S.Ct. 678 (2014), the court of appeal held that the trial court did not abuse its discretion in admitting testimony from a special agent as an expert in the field of historical cell site analysis.

16

In *State v. Saltzman*, 13-276 (La. App. 3 Cir. 10/23/13), 128 So. 3d 1060, the state introduced an FBI special agent as an expert in historical cell site analysis who, similar to Mr. Fegley in this case, was able to demonstrate the cell towers used as well as the range of the towers. The defendant in that case challenged the admission of the agent's testimony on appeal and the court of appeal upheld the trial court's ruling admitting the agent's testimony and affirmed the conviction.

In *State v. Caballero*, 22-0441 (La. App. 1 Cir. 11/4/22), 356 So. 3d 389, *writ denied*, 22-01777 (La. 4/25/23), 359 So. 3d 982, a sheriff's deputy testified as an expert in cell phone data analysis and used the cell phone records to determine the location of the defendant's boyfriend's phone. The court of appeal found the evidence sufficient to uphold the convictions.

As these cases make clear, Louisiana courts have been qualifying cell phone geolocation experts and recognizing this area of expertise as a valid evidentiary source for at least ten years. Furthermore, both the state and Tabb presented their own experts regarding the issue, and the jury was free to weigh the credibility and information presented by both experts. It is not erroneous if the jurors found Mr. Fegley and his evidence more credible.

Finally, we note that the state's evidence was not solely dependent upon the geolocation of Tabb's cell phone; rather, there was a plethora of evidence, including, but not limited to: (1) Josh's testimony and identification of Tabb as his attacker; (2) Donnie's testimony that Tabb had blood on his arm and on the door of his truck,

17

(3) Tabb's confession that thought he killed someone, (4) the shotgun seen in Tabb's truck, and (5) the expert testimony regarding Josh's DNA found on, among other things, the bow release. This assignment of error lacks merit.

*Plea Form*

For Tabb's final counseled assignment of error, he argues the state's use of Terrance's plea form without a sentence deprived him of a due process defense. He asserts that the jury should have been able to consider exactly what benefit Terrance got for testifying, and that the presentation of his plea form with a narrative of Tabb's alleged crimes was prejudicial to him.

In response, the state argues that Tabb waived the right to appeal that claim since there was no contemporaneous objection at trial. However, even if Tabb did not waive the claim on appeal, the state argues that he failed to demonstrate any actual prejudice through the introduction of the plea agreement since his counsel questioned Terrance extensively about the agreement and his motivations for testifying.

The purpose of the contemporaneous objection rule is to put the trial judge on notice of an alleged irregularity, allowing him the opportunity to make the proper ruling and correct any claimed prejudice to the defendant, procedural irregularity, or evidentiary mistake. *State v. Benoit*, 17-187 (La. App. 5 Cir. 12/29/17), 237 So. 3d 1214.

Here, Tabb argues for the first time on appeal that the state's use of Terrance's plea form without a sentence deprived him of a due

18

process defense because the jury should have been able to consider what benefits his codefendant received for testifying against him. However, argument is limited to those grounds raised at trial; a new basis for objection cannot be raised for the first time on appeal. La. C. Cr. P. art. 841(A). Since there was no contemporaneous objection at trial, Tabb waived his right to raise this claim on appeal.

Even if Tabb had properly raised this claim on appeal, it still lacks merit. The record reflects that the state reviewed the agreement with Terrance, indicating that he would plead guilty to a "responsive charge of second-degree rape and the charge of attempted armed robbery" and receive a "thirty-five year sentencing cap" which was read before the jury. Moreover, Tabb's right to cross-examine Terrance and ask him about any leverage the state held over him was clearly not infringed upon, because Tabb's counsel questioned Terrance extensively about the plea form and his motivations for testifying. This assignment of error is without merit.

*Pro Se Assignments of Error*

In his first pro se assignment of error, Tabb argues that the court erred in authorizing the testimony of a DNA expert who did not conduct the actual DNA analysis and that this error violated his Sixth Amendment right to confrontation. However, the crime lab director Mr. Berry testified that it was standard procedure for Ms. Rash, one of three reviewers on both DNA reports, to testify regarding the results of the analysis. Furthermore, Ms. Rash testified that the technical reviewer has the critical role of ensuring all the work done was technically correct, the lab work was proper, and that the conclusions

are the same conclusions she would have reached had she been the testing analyst.

In *Bullcoming v. New Mexico*, 564 U.S. 647, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011), the United States Supreme Court ruled that the testimony of a scientist who signed the certification or performed or observed the test reported in the certification was necessary for forensic science evidence.  Here, Ms. Rash met those requirements since she served as the technical reviewer on the 2018 report and the administrative reviewer on the 2020 report.  Accordingly, this assignment of error lacks merit.

Tabb claims in his second pro se assignment of error that the court erred by allowing an untestable Cybergenetics program, specifically, the TrueAllele analysis and report that was admitted at trial.  However, the record is clear: there was no objection at trial to the use of the TrueAllele program or its reliability, and Ms. Naylor was present for cross-examination regarding her ability and qualifications to use the program.  This assignment of error lacks merit.

Tabb's third pro se assignment of error is that his three convictions somehow constituted a double jeopardy violation.  The appropriate standard for double jeopardy claims is the *Blockburger* test and Tabb's three convictions hold up under *Blockburger.*

In *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), the United States Supreme Court set out a precise rule of law to determine if a double jeopardy violation has occurred:

The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions the test to be applied to determine whether there are two different offenses or only one, is whether each provision requires proof of an additional fact which the other does not.

Tabb's convictions do not meet the *Blockburger* test[1] since each provision requires proof of an additional fact which the other does not. Attempted second-degree murder requires proof of the specific intent to kill which is not an element of aggravated burglary or armed robbery. Aggravated burglary requires the entry (or attempted entry) of an inhabited dwelling which is not an element of attempted murder or armed robbery. Armed robbery requires the taking (or attempted taking) of something of value from someone with the use of force. This element is not required for attempted second-degree murder or aggravated burglary.

Tabb fails to meet the burden of proof under his double jeopardy claim since each of his three convictions requires the proof of at least one additional fact which is not required by the other two provisions. This assignment of error has no merit.

Tabb's final pro se assignment of error alleges prosecutorial misconduct due to improper remarks made by the prosecutor. Claims of prosecutorial misconduct must adhere to the contemporaneous objection rule and a defendant waives his right to raise the issue on appeal if no objection is lodged at trial. *State ex rel. E.D.C.*, 39,892

---

[1] Louisiana courts need only apply the analytical framework set forth in *Blockburger* in analyzing questions of double jeopardy. *State v. Frank*, 16-1160 (La. 10/18/17), 234 So. 3d 27.

21

(La. App. 2 Cir. 5/11/05), 903 So. 2d 571, *writ denied*, 05-1568 (La. 1/27/06), 922 So. 3d 544.

This is another instance of Tabb arguing issues on appeal that were not first raised at the trial court. When the complained-of statements were made by the prosecutor, no contemporaneous objection was lodged nor was any motion for a mistrial filed by Tabb. Tabb is therefore precluded from seeking review of such statements with this court. Accordingly, this assignment of error is without merit.

*Error Patent Review*

Our error patent review of the record revealed the trial court failed to impose proper restriction of sentence benefits as to Tabb's attempted second-degree murder and attempted armed robbery convictions. However, since the corresponding statutes for those crimes required the sentences to be served without benefits, this is harmless error.

La. R.S. 15:301.1(A) provides in pertinent part that the failure of a sentencing court to specifically state that all or a portion of the sentence is to be served without benefit of probation, parole, or suspension of sentence shall not in any way affect the statutory requirement that all or a portion of the sentence be served without benefit of probation, parole, or suspension of sentence. There is no need to remand for correction of the sentencing error. When a district court fails to order statutorily mandated service of sentence without benefits, the sentence will automatically be served without benefits for the required time period. *State v. Pierce*, 51,145 (La. App. 2 Cir.

2/15/17), *writ denied*, 17-0661 (La. 4/6/18), 240 So. 3d 184; *State v. Williams*, 00-1725 (La. 11/28/01), 800 So. 2d 790.

We order that the entirety of the hard labor sentences for Tabb's attempted second-degree murder and attempted armed robbery convictions be served without benefits. We also order that the trial court minutes be amended to reflect this sentencing adjustment.

## CONCLUSION

For the foregoing reasons, Tabb's convictions and sentences are affirmed.

**AFFIRMED**.